UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JENNIFER ROLLINS,

     Plaintiff,

v.                        Case No. 8:19-cv-2336-T-33SPF

BANKER LOPEZ & GASSLER, PA,

     Defendant.

_____/

## ORDER

     This matter is before the Court on consideration of Defendant Banker Lopez & Gassler, PA's Motion for Summary Judgment (Doc. # 39), filed on April 28, 2020. Plaintiff Jennifer Rollins responded on May 19, 2020. (Doc. # 45). BLG filed a reply on June 11, 2020. (Doc. # 47). For the reasons that follow, the Motion is granted.

**I.**   **Background**

     **A.**   **Beginning of Rollins' Employment**

     Banker Lopez & Gassler (BLG) is a law firm with 80 attorneys and 170 staff members across six Florida offices (Doc. # 40-11 at 1). Before joining BLG, Rollins worked for two law firms between 2013 and 2016. (Doc. # 40-1 at 7:23-10:4; Doc. # 40-4; Doc. # 40-5). When Rollins applied to BLG in January 2017, she was unemployed, having had a second child in March 2016 and treatment for a cerebral aneurysm in June

1

2016. (Doc. # 40-1 at 10:14-12:25). Rollins told BLG during her interview she had an aneurysm in 2016. (Id. at 206:8-21).

On January 19, 2017, BLG offered Rollins a position as a legal assistant in the Personal Injury Protection/Special Investigative Unit (PIP/SIU) practice group in the St. Petersburg office. (Id. at 209:10-25; Doc. # 40-6). PIP/SIU defends insurers in PIP and auto windshield replacement cases ("glass cases"). (Doc. # 40-1 at 81:15-83:15; Doc. # 40-10 at 2). BLG attorneys handle hundreds of PIP and glass cases at a time, largely in small claims court. (Doc. # 40-1 at 183:19-24; Doc. # 40-10 at 2-3).

Legal assistants in the PIP/SIU group were responsible for calendaring deadlines, filing and serving pleadings, and coordinating depositions, hearings, and trial for each lawyer's 300-500 cases. (Doc. # 40-1 at 183:5-12; Doc. # 40-11 at 10; Doc. # 40-10 at 3; Doc. # 40-9 at 1). Thus, legal assistants like Rollins "had to be organized and able to prioritize a large number of small competing tasks with a high level of attention to detail." (Doc. # 40-11 at 2, 10). "The attorney-to-assistant ratio in the PIP/SIU [p]ractice [g]roup varies and depends on the volume and complexity of each attorney's practice, among other factors." (Doc. # 40-10 at 3). "There is no hard-and-fast rule as to how many

2

attorneys a PIP/SIU legal assistant is expected to support." (Id.). A full-time legal assistant would usually support between one and four attorneys, "although attorney assignments and number of attorneys may change periodically, depending on business needs." (Id.).

According to Troy McRitchie, the managing shareholder of BLG's St. Petersburg office, Rollins' performance "was lacking from the very beginning." (Id. at 1, 3). On February 23, 2017, Rollins received a 30-day evaluation from the Chair of the Statewide PIP/SIU Practice Group, Dale Parker. (Doc. # 40-1 at 87:8-12, 210:7-11; Doc. # 40-7; Doc. # 40-10 at 2, 4). Parker recognized that Rollins was still "learning" but rated her performance as "below expectations" in the areas of "quality of work and organizational skills." (Doc. # 40-1 at 87:8-15, 210:12-22; Doc. # 40-7; Doc. # 40-11 at 1-2).

In June 2017, BLG assigned Rollins to PIP attorney Eric Hogrefe. (Doc. # 40-1 at 62:21-25; Doc. # 40-11 at 2, 11). According to Rollins, Hogrefe was "very self-sufficient" and did not "utilize [her] that much." (Doc. # 40-1 at 88:4-9). Hogrefe did not provide Rollins with feedback on her performance one way or the other. (Id. at 88:16-18).

Still, Rollins made numerous mistakes on Hogrefe's cases. For example, Rollins scheduled a deposition in Orlando

on his calendar but failed to subpoena the witness, notice the deposition, or clear it with opposing counsel; she only arranged it with a court reporter's office. (Doc. # 40-9 at 2). After "fighting the I-4 rush-hour traffic for [] 2 hours," Hogrefe learned Rollins had failed to set up the deposition, despite supposedly confirming that it was going forward, and had to turn around and drive back. (Id.). Another time, Rollins mis-calendared a pretrial conference, causing Hogrefe to miss it. (Id.). After driving three hours from St. Petersburg to New Smyrna Beach and staying at a hotel overnight, Hogrefe headed to court the next day only to find out the pretrial conference had already happened, without anyone from BLG attending. (Id.). A court order changing the date and time of the conference had been processed by Rollins. (Id.). After these errors, Hogrefe simply stopped using Rollins. (Id.).

BLG employees "may not use social media while on work time or on Firm equipment or devices, unless it is work-related and authorized in advance." (Doc. # 40-11 at 38). Yet, in September 2017, shareholder McRitchie learned Rollins was browsing Facebook while clocked in. McRitchie asked BLG's IT Director, Jason Clements, to research Rollins' total time spent on Facebook. (Id. at 2, 87; Doc. # 40-10 at 4). Clements

told McRitchie that, as of 3:00 p.m. that day alone, Rollins had been logged onto Facebook since 8:48 a.m. (Doc. # 40-11 at 87). Two days later, PIP/SIU leader Parker told Rollins not to use Facebook or any other social media while on the clock after he saw her minimize a Facebook page when he walked by. (Id. at 2, 88).

On October 23, 2017, Rollins emailed Hogrefe, Parker, McRitchie, and HR Director Erin Esquia to inform them that she was pregnant. (Id. at 2, 89-92). The pregnancy was "very early on" but Rollins asked about the process for taking leave under the Family Medical Leave Act (FMLA). (Id.; Doc. # 40-1 at 211:15-212:1). Esquia congratulated Rollins and, although Rollins was not yet eligible for FMLA, discussed the FMLA and short-term disability claim processes with her. (Id. at 76:4-17; Doc. # 40-11 at 89-92). According to BLG, similar requests for maternity leave are common at BLG. Since being founded in 2008, BLG has approved FMLA for one hundred forty employees, including thirty-five FMLA-covered maternity leaves. (Doc. # 40-11 at 2-3).

Hogrefe left BLG in November 2017, and BLG assigned Rollins to associates Kristin Gonzalez and Nathan Zilak. (Id. at 3; Doc. # 40-1 at 77:14-21). Hogrefe left behind active PIP cases and, because both Gonzalez and Zilak "were already

5

busy with their own caseloads," McRitchie took over Hogrefe's PIP cases. (Doc. # 40-10 at 4). BLG kept those PIP cases assigned to Rollins for November and December 2017 for her to resolve or transfer to McRitchie's legal assistant. (Id.).

Rollins made numerous errors during November and December. She failed to timely submit a stipulation to the court, forgot to deliver files to McRitchie, and failed to add items on his calendar, including a pretrial conference, which resulted in a default against a BLG client, causing the firm to scramble to set the default aside. (Id. at 4-5; Doc. # 40-11 at 3, 94-99). Rollins told McRitchie she did not know "where [her] head was," and was "a terrible, terrible assistant." (Doc. # 40-11 at 98-99). Although McRitchie counseled her, he did not formally discipline Rollins for causing the default. (Doc. # 40-10 at 5).

On January 5, 2018, Rollins volunteered to take on a third attorney, Alex Peckham. (Id. at 3, 93). Soon after, on January 16, Rollins failed to calendar a deadline for responding to requests for admission in Gonzalez's case. (Id. at 3, 100-101). After receiving a conferral letter setting a deadline to respond and threatening to file a motion to deem the requests admitted if Gonzalez failed to respond, Rollins failed to pass the letter to Gonzalez. (Id.). Gonzalez learned

of the issue only when the deadline had passed and opposing counsel had filed his motion. (Id.). Gonzalez informed Rollins that her mistake was "a pretty big deal." (Id. at 101). Rollins "[t]otally agree[d]—[she] screwed this up." (Id. at 100).

Additionally, in October and November 2017, Gonzalez had twice asked Rollins to reset a hearing. (Id. at 3, 102). After receiving no response, Gonzalez followed up for the third time on January 23, 2018, and Rollins finally reset it. (Id.). Gonzalez told Rollins she could ask BLG's scheduler to help if she needed assistance with the scheduling. (Id.).

Because of these and other performance errors, Gonzalez shared her concerns about Rollins with Parker on March 8, 2018. (Id. at 103). They discussed Rollins' failure to calendar exhibit exchange deadlines in two cases, the January 16 failure to send the admissions conferral letter, and her failure to allow sufficient travel time between events resulting in Gonzalez arriving late. (Id.).

The next day, March 9, Parker, McRitchie, and HR Director Esquia met with Rollins to "counsel[] her regarding mis-calendaring and missing deadlines, being behind on attorney time slips, and abuse of her cellphone at work." (Id. at 3-4; Doc. # 40-8; Doc. # 40-1 at 214:14-215:12). Rollins admits

she "used [her] phone a lot," which "was an issue." (Doc. # 40-1 at 104:21-105:1).

During the March 9 meeting, Rollins complained about her workload. (Doc. # 40-11 at 3; Doc. # 40-8; Doc. # 40-1 at 214:1-6). She claimed she was missing an hour and a half covering the front desk because she had no access to calendars and case folders from the front desk computer. (Doc. # 40-1 at 218:4-7, 219:9-13). Esquia had IT ensure Rollins had access and ultimately trained others to cover the front desk so Rollins never had to. (Doc. # 40-8; Doc. # 40-1 at 218:4-219:13). Esquia, Parker, and McRitchie reiterated BLG's calendaring and other procedures to Rollins, instructed her to limit her cellphone use, and placed a warning memo in her file. (Doc. # 40-8; Doc. # 40-1 at 214:18-215:18).

Following the March 9 meeting, Rollins' assigned attorneys continued to have problems with her performance. On March 12, attorney Peckham discovered Rollins had failed to schedule or confirm the appearance of an adjuster at a mediation he arrived for in Fort Lauderdale. (Doc. # 40-11 at 4, 107; Doc. # 40-10 at 5). This potentially exposed the client to sanctions for failing to appear and caused Peckham to have to "scramble" to reschedule. (Doc. # 40-11 at 4, 107; Doc. # 40-10 at 5).

8

On March 13, attorney Gonzalez had to ask Rollins for the third time to set up witness depositions after Rollins failed to acknowledge Gonzalez's first two requests. (Doc. # 40-11 at 4, 106). On March 14, Gonzalez asked Rollins for the second time to set up a phone conference; Rollins also failed to send a letter to a client that day. (<u>Id.</u> at 4, 108). The next day, March 15, Gonzalez narrowly avoided driving from St. Petersburg to Orlando for a hearing that was cancelled. (<u>Id.</u> at 109). Luckily, Gonzalez learned about the cancellation from opposing counsel right before leaving. (<u>Id.</u>). Rollins was coached about the importance of confirming attorney calendars and referred to legal assistant Linda Croce for best practices on confirming cancellations. (<u>Id.</u> at 110).

The next month, Peckham arrived at a deposition to find that the deponent was not there, even though both parties and the court reporter were present. (<u>Id.</u> at 4, 111-12). It turned out that Rollins had canceled the deposition with the deponent, but failed to notice the cancellation and failed to tell anyone it was cancelled. (<u>Id.</u> at 111-12). Rollins admitted in a later email it was her fault: "Oh my gosh! Yes! DAMMIT! . . . I am so so so sorry. I can't believe I neglected

to do that. It completely slipped my mind when I did the confirmations! I'm an ass. I'm so sorry." (Id. at 111).

Rollins was out on FMLA maternity leave from June 2018 to September 4, 2018. (Id. at 3; Doc. # 40-1 at 48:5-10). Meanwhile, June 2018 was an especially busy time for BLG's already busy PIP/SIU practice group. (Doc. # 40-1 at 95:1-17, 97:11-17; Doc. # 40-10 at 5). A client "sent a large number of new glass cases to BLG to handle." (Doc. # 40-10 at 5). BLG hired a rising second-year law student, Kristina Harris, to fill in for Rollins and help with the new cases. (Id. at 6; Doc. # 40-1 at 93:8-11). Harris supported all three of Rollins' attorneys plus Rachel Swansiger, a new attorney who was hired to handle the new glass cases and started on June 11, 2018. (Doc. # 40-1 at 93:12-18, 94:3-7; Doc. # 40-10 at 6; Doc. # 40-11 at 4). Harris was on top of the work and successfully caught up all four attorneys in Rollins' absence. (Doc. # 40-10 at 6).

**B.   Return from FMLA Maternity Leave**

Rollins returned from FMLA maternity leave on September 4, 2018, and BLG reinstated her. (Doc. # 40-11 at 3). Rollins admits that BLG did not discriminate against her in any way before she returned from FMLA leave. (Doc. # 40-1 at 52:10-16).

BLG accommodated Rollins "with an empty office with blinds on the windows and a lock on the door as a lactation room." (Doc. # 40-11 at 4). Esquia avers that she "encouraged [Rollins] to take breaks to pump milk whenever she needed them" and "BLG approved [] Rollins to take lactation breaks." (Id.). Although Rollins acknowledges that she "was told that [she] was allowed to take breaks to pump breast milk during the day," Rollins denies that she was encouraged to take lactation breaks whenever she needed. (Doc. # 45-3 at 1-2).

According to Rollins, she needed to pump two to three times a day for thirty to forty minutes each time. (Id. at 1). "However, because of [her] workload and the fact that [she] was not allowed to work extra hours to catch up on [her] assignments, [Rollins] was never able to take three breaks in a day, and some days [she] was unable to take even one." (Id.). Rollins "informed [] Gonzalez of this issue but nothing was done." (Id.).

When Rollins returned, she worked for three of the same attorneys as before — Gonzalez, Zilak and Peckham — and now also Swansiger. (Doc. # 40-1 at 51:10-13, 78:5-79:10, 94:8-13). The influx of cases that began while Rollins was out on FMLA leave continued after Rollins' return. (Id. at 95:1-17; Doc. # 40-10 at 5-6). Rollins was doing the same type of work

11

as before, but more of it in volume. (Doc. # 40-1 at 92:5-22). Rollins testified that her workload increased because of the new cases, not because of the number of her attorneys. (Id. at 92:14-22). Specifically, when asked if the dramatic increase in her work volume after maternity leave was "because an additional lawyer was assigned to" her, Rollins responded: "No, it wasn't because of [an] additional [lawyer] — we had a heavy increase of new cases coming in." (Id.).

The influx of new cases affected everyone — not just Rollins. (Id. at 95:21-96:21). Rollins testified that all staff were overwhelmed: "We were all swamped. . . . I don't know how much work [other people] had, but everybody was busy. It was hard for anyone to help each other out. So if I, say for instance needed [another legal assistant's] help, she would get behind on her work." (Id. at 98:12-20, 192:3, 192:10-14). Attorneys were just as frustrated with their workload. (Id. at 96:1-11). Rollins noted that "it was just a general understanding throughout the office that there was just too much work." (Id. at 189:5-8). Still, Rollins also testified that she "was the only one that had that amount of work" and "was the only one that was given that many attorneys and that many cases." (Id. at 189:9-15).

To help with the workload, BLG retained law student Harris as a part-time legal secretary after Rollins' return. (Id. at 190:23-191:3; Doc. # 40-10 at 6). When Rollins was overwhelmed, an attorney would often tell her to delegate work to Harris. (Doc. # 40-1 at 191:13-25). To help Rollins manage her workload, BLG asked Harris to provide Rollins with additional training. (Doc. # 40-10 at 6). Harris also created a detailed "What I Do Every Day" list of daily tasks for Rollins. (Doc. # 40-11 at 4, 113-115). Harris similarly put together a "PIP in a Nutshell" guide for Rollins, detailing the handling of PIP cases, including everything from serving answers to scheduling to settlement. (Id. at 4, 116-117). Although Rollins acknowledged that Harris previously successfully kept up with the same workload, saying that Harris "must have worked miracles," Rollins complained that she was so busy she was barely "clinging to life." (Doc. # 40-11 at 118; Doc. # 40-10 at 6).

A few days after her return from leave, on September 7, 2018, BLG announced new streamlined procedures for handling PIP cases and better managing the workflow. (Doc. # 40-11 at 5, 119-120). BLG told staff to immediately let attorneys know if they fell behind and needed help, and they could delegate work to other staff. (Doc. # 40-11 at 119). However,

"[a]ttorney approval [was] required before assigning a task to any other staff member." (Id.). BLG later held a staff meeting about the new procedures, including handling of PIP and glass service emails; opening, handling, and scheduling of PIP cases; and self-organization. (Id. at 5, 119-120; Doc. # 40-10 at 6).

Rollins declared that she "was told that [she] could ask for help if [she] was overwhelmed." (Doc. # 45-3 at 1). But, "when [she] did ask another assistant for help, [she] was reprimanded and told that [she] had to ask an attorney's permission each time prior to asking another staff member for help." (Id.). Rollins considered asking for attorney approval first to be impractical. (Id.).

On September 18, Gonzalez learned Rollins had failed to file a response to a complaint due on September 6 — two days after Rollins came back to work. (Doc. # 40-11 at 5, 121-22). Rollins couldn't explain "how [she] missed that." (Id. at 121-22).

On September 25, HR Director Esquia and Gonzalez met with Rollins to discuss her "time-management and performance versus [BLG's] expectations." (Doc. # 40-11 at 5, 123). According to Esquia, Rollins complained about her workload but admitted BLG's "new PIP case handling procedures were

14

working." (Id.). But Rollins avers that she "did not tell []
Esquia that BLG's new PIP case handling procedures were
'working.'" (Doc. # 45-3 at 1).

According to McRitchie, Rollins "was given extensive
guidance and training" with twelve-year veteran
paralegal/legal assistant Tammie Hogan, so that Rollins could
further learn from Hogan about the responsibilities of her
job. (Doc. # 40-10 at 6). However, Rollins asserts that she
"was not given 'extensive guidance and training'" with Hogan
"at any time." (Doc. # 45-3 at 2).

BLG also temporarily reassigned Gonzalez's and Peckham's
PIP cases to Harris in September 2018, so that Rollins could
focus only on her attorneys' glass cases, which are less
involved and which she preferred. (Doc. # 40-1 at 81:23-82:1,
84:1-4; Doc. # 40-11 at 5, 118).[1]

Soon after the September 25, 2018, meeting, on September
28, Gonzalez emailed Rollins because Rollins had not
calendared any deadlines for a case she opened five months
earlier in April 2018. (Doc. # 40-11 at 5, 124).

On November 6, BLG assigned a staff person from another
practice group to assist Rollins with a proposal for

---

[1] As of mid-February 2019, Rollins had taken back over the
PIP cases. (Doc. # 40-11 at 131-32).

15

settlement project. (Doc. # 40-11 at 5, 127; Doc. # 45-3 at 2). While Rollins acknowledges that the staff person was assigned to help her on the project, Rollins asserts the other staff person was not able to help with her backlog. (Doc. # 45-3 at 2). She notes that she had to train the staff person on the project, "which took even more time away from [Rollins'] primary duties." (Id.). Rollins also insists that, around this time, she "had already told [her] attorneys multiple times that [she] was having trouble keeping up, was already skipping lunches and unable to take breaks to express breast milk as needed." (Id.).

To further help manage the workload, on February 4, 2019, BLG hired another legal assistant, Mija Howell, and reassigned attorney Zilak from Rollins to Howell so that Rollins could focus on Gonzalez's and Peckham's work. (Doc. # 40-11 at 5; Doc. # 40-1 at 127:13-15). At this time, BLG "returned [Gonzalez's and Peckham's] PIP cases back to [] Rollins." (Doc. # 40-11 at 5). Rollins disputes that Howell's hiring was helpful because Howell "was still in training and did not fully take over [] Zilak's workload from [Rollins] until shortly before" March 25, 2019. (Doc. # 45-3 at 2).

Attorney Swansiger left BLG on February 15. (Doc. # 40-11 at 6; Doc. # 40-1 at 127:10). Thus, by mid-February,

Rollins was again supporting only two attorneys. (Doc. # 40-1 at 127:10-128:2). Indeed, in a February 27 email, Rollins stated that she now "ha[d] 2 attorneys instead of 4." (Doc. # 40-11 at 131). Eventually, about a week before she left BLG in late March, Rollins was assigned a third attorney — Niklas Stubbendorf. (Id. at 127:18-23; Doc. # 45-3 at 2).

Despite having fewer attorneys to support as of mid-February, Rollins was still behind on her work. Rollins was passing off work without approval, unnecessarily elevating file-related questions to attorneys that could have been answered by referring to the file, and failing to timely communicate with attorneys. (Doc. # 40-11 at 129-130; Doc. # 40-10 at 6).

On February 22, Brendan McKay, who helped oversee the PIP/SIU practice group, Gonzalez, Peckham, and Esquia met with Rollins. (Doc. # 40-11 at 6, 128-30; Doc. # 40-10 at 7). They told Rollins that her performance needed to improve "immediately, subject to review in [thirty to forty-five] days, or she was subject to termination." (Doc. # 40-11 at 6, 128-30; Doc. # 40-10 at 7). Rollins alleges that during this meeting, she complained about having trouble taking sufficient lactation breaks because of the workload. (Doc. # 1 at 4).

After the February 22 meeting, Rollins' performance problems continued. (Doc. # 40-11 at 6). On February 26, Gonzalez asked Rollins again to schedule an initial phase conference, after making this same request in other cases. (Id. at 6, 131-32). A BLG client had "recently pulled a ton of PIP cases" from another law firm for failing to keep up with this task. (Id. at 132).

Rollins claimed in her February 27 response email that, although she now supported only "2 attorneys instead of 4," she was still too busy. (Doc. # 40-11 at 131-32). She also reminded Gonzalez about her aneurysm and that the work-related stress caused intense headaches "at least twice a week." (Id. at 131). While Rollins asked Gonzalez to "come up with a better plan" for her workload, she did not specify what action she wanted BLG to take in light of her aneurysm. (Id. at 131-32).

C.  **Rollins' Health Issues and Termination**

Rollins claims her cerebral aneurysm is a disability for purposes of her disability discrimination claim. (Doc. # 40-1 at 9:4-7). Rollins was diagnosed with an aneurysm in June 2016. (Id. at 8:20-22, 10:22-23). She was treated with a stent and took blood thinners for four months, but she has only taken daily aspirin since. (Id. at 11:10-12:6). Rollins'

18

aneurysm can cause headaches, nausea, and impaired vision. (Id. at 18:12-17, 24:5-16). Although these symptoms can last from a couple of hours to a couple of days, they are typically not severe enough to cause her to go to the emergency room, and Rollins sleeps them off. (Id. at 18:20-19:3, 24:17-25:8). Rollins testified that these symptoms made her unable to work only on "some days." (Id. at 24:17-18). Still, in her declaration, Rollins avers that the vision issues and headaches "ma[de] [her] unable to work, drive, read, concentrate, think clearly, and see." (Doc. # 45-3 at 1). Rollins admits she could leave work any time she experienced a headache and no one at BLG ever opposed her early departures from work. (Doc. # 40-1 at 55:2-10). Rollins does not know how many times she left early due to a headache before her maternity leave. (Id. at 55:11-16).

Rollins twice requested time off related to the aneurysm. In June 2017, she requested time off for a cerebral angiogram and a potential hospital admission. (Doc. # 40-11 at 8, 152). BLG granted Rollins paid time off. (Id.). Later, in May 2018, Rollins requested a week off due to her hospitalization, and BLG granted her request. (Doc. # 40-1 at 114:11-17; Doc. # 40-11 at 154-155). A doctor at the hospital told Rollins she had developed a second aneurysm, but it

19

turned out later he was mistaken. (Doc. # 40-1 at 112:6-113:21). Since 2016, Rollins has seen a neurologist between five and six times — the last in August 2018 — and has gone to the emergency room with a headache around four times. (Id. at 14:15-15:3, 16:21-17:7, 19:25-20:19, 22:22-25). During her deposition, Rollins stated that she "didn't need" an accommodation for her aneurysm when she began working for BLG and that she did not require an accommodation currently. (Id. at 206:22-207:6).

Soon after her February 27 email to Gonzalez in which Rollins noted her aneurysm and related headaches, Rollins emailed opposing counsel from one of Gonzalez's cases on March 4. (Doc. # 40-11 at 136). She asked him to waive Gonzalez's in-person appearance at a pretrial conference in Escambia County. (Id.). Opposing counsel did not agree. (Id. at 135). Rollins neither communicated this to Gonzalez nor calendared the in-person conference. (Id. at 6, 133-136).

On March 13, the court entered a default in that case against BLG's client because Gonzalez had failed to appear in person at the conference. (Id.). Rollins acknowledged her actions by claiming she "didn't get to the [opposing counsel's] email . . . . I'm so sorry." (Id. at 134; Doc. # 40-10 at 7). Rollins admits her responsibility for causing

20

the default. (Doc. # 40-1 at 183:25-184:11). Although BLG holds non-attorney staff accountable for case deadlines (Doc. # 45-2 at 105:1-106:17), Gonzalez once sent an email in September 2018 to attorneys stating:

> When a new file is opened for you, you'll receive a notecard that will have a check-list of items the assistant was required to do prior to handing off the case to you. It is the attorney's responsibility to review the notecard to be sure every item on the list is checked/completed.

(Doc. # 40-11 at 119).

Also around this time, on March 11, Rollins opened a file, but failed to calendar deadlines. (Doc. # 40-11 at 6, 137). This was not discovered until a month later. BLG narrowly avoided another default. (Id.).

BLG considered the March 13 default the "the last straw." (Doc. # 40-10 at 7; Doc. # 40-11 at 145). Gonzalez, Esquia, Parker, and McRitchie decided together to terminate Rollins. (Doc. # 40-11 at 6). Rollins' employment ended on March 25, 2019. (Doc. # 40-1 at 187:8-16; Doc. # 40-10 at 7; Doc. # 40-11 at 7, 145).

Rollins admits she "absolutely" made performance errors before her FMLA leave, and they continued after her return. (Doc. # 40-1 at 182:17-22, 186:15-187:7). While Rollins admits she "had made some mistakes," she states in her

declaration that she was "never disciplined or written up until after [she] took maternity leave." (Doc. # 45-3 at 1). She emphasizes that all legal assistants in the PIP/SIU practice group made mistakes, but none were fired while Rollins worked there. (Id.). Rollins also avers that she "was never threatened with losing [her] job until after [she] returned from maternity leave." (Id.).

Also on March 25, BLG terminated another legal assistant in Tampa, Angela Curvelo. (Doc. # 40-11 at 7). Curvelo was terminated "for various performance issues, including failure to correctly process settlement checks and timely save documents to case files." (Id.). Prior to her termination, BLG "had multiple performance coachings with [] Curvelo, but she failed to show improvement." (Id.). BLG also highlights three other legal assistants it terminated between June 2018 and October 2019 for performance issues. (Id.).

Regarding comparators, Rollins testified that there were only two other legal assistants in the PIP/SIU practice group: Onelja Shehaj and Linda Croce. (Doc. # 40-1 at 90:20-25). Rollins averred in her declaration that she once overheard Shehaj "flatly refus[e] to do work assigned by her attorney." (Doc. # 45-3 at 2). Additionally, Rollins emphasizes that Shehaj "was counseled more than once about working

unauthorized overtime." (Doc. # 45 at 7). Rollins believes Shehaj "did not take FMLA leave while working for BLG, was not pregnant while working for BLG, and was not disabled while working for BLG." (Doc. # 45-3 at 2).

Shehaj typically supported one attorney, but sometimes two, and was also overwhelmed. (Doc. # 40-1 at 89:17-90:8, 98:7-25; Doc. # 40-11 at 8). Notably, the primary attorney Shehaj supported handled not only hundreds of PIP cases but also a large number of bodily injury cases, which are much more involved than PIP and glass cases. (Doc. # 40-11 at 8). Also, Shehaj "was competent and skilled," and the performance reviews from her first 90 days of employment in 2017 show that Shehaj always met or exceeded expectations. (Id. at 8, 149-151).

Croce supported "only the Statewide Head of the PIP/SIU [p]ractice [g]roup," Parker. (Doc. # 40-11 at 8). "Unlike the attorneys assigned to [] Rollins and [] Shehaj, [] Parker is a shareholder and [] oversees an entire practice group." (Id.). Croce also supported Parker on different and more complex types of cases, "including bodily injury, uninsured motorist, property damage, negligent security, and false arrests." (Id.). There are no disciplinary documents in Croce's file. (Id.).

One legal assistant in one of BLG's offices was allowed to work from home — Megan Fight. Fight is a legal assistant in BLG's Tampa office in the general trial practice group. (Doc. # 45-2 at 60:6-61:14). It is unclear why Fight is permitted to work from home; however, she does not work from home as an accommodation for a disability. (Id.). Yet, Rollins points out that her requests "to work from home to catch up on [her] assignments . . . were either ignored or denied." (Doc. # 45-3 at 1). Rollins' requests to work additional hours — that is, overtime — were likewise "ignored or denied." (Id.).

### D.   **Procedural History**

Rollins initiated this action on September 20, 2019, asserting claims for: pregnancy discrimination in violation of the Pregnancy Discrimination Act (PDA) (Count 1); retaliation in violation of the PDA (Count 2); retaliation in violation of the Family and Medical Leave Act (FMLA) (Count 3); pregnancy discrimination in violation of the Florida Civil Rights Act (FCRA) (Count 4); retaliation in violation of the FCRA (Count 5); disability discrimination in violation of the Americans with Disabilities Act (ADA) (Count 6); and disability discrimination in violation of the FCRA (Count 7).

(Doc. # 1). BLG filed its answer on November 4, 2019, (Doc. # 18), and the case proceeded through discovery.

Now, BLG seeks summary judgment on all claims. (Doc. # 39). The Motion is ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at

trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

26

III. **Analysis**

A.   **ADA Retaliation**

The complaint does not include a count for ADA retaliation. The only count regarding the ADA is Count 6 for "[d]iscrimination in violation of the [ADA]." (Doc. # 1 at 8-9). While Rollins does assert an FCRA retaliation claim, that claim is premised solely on alleged retaliation based on Rollins' allegedly complaining about pregnancy discrimination. (Id. at 8)(alleging that "Rollins engaged in protected activity by complaining about discriminatory treatment based on her pregnancy" and was fired "a month after [she] complained of pregnancy discrimination"). Thus, nowhere in the complaint has Rollins alleged that BLG retaliated against her on the basis of her disability — the cerebral aneurysm. Yet, in her response to the Motion, Rollins argues that she has established a prima facie case of ADA retaliation. (Doc. # 45 at 19).

This is impermissible. Rollins cannot amend her complaint in response to a summary judgment motion. See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004)("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A

plaintiff may not amend her complaint through argument in a brief opposing summary judgment."). After the Court brought this issue to Rollins' attention (Doc. # 50), Rollins moved to amend the complaint to add an ADA retaliation claim. However, that motion was denied. (Doc. # 59). Thus, Rollins cannot now assert a claim for ADA retaliation.

### B.  **Pregnancy Retaliation**

In Count 2 of the complaint, Rollins asserts a claim for retaliation in violation of the PDA, alleging BLG terminated her employment in retaliation for complaining about perceived pregnancy discrimination. (Doc. # 1 at 5-6). Similarly, Rollins asserts a claim for retaliation based on pregnancy in violation of the FCRA in Count 5, alleging BLG terminated her for "complaining about discriminatory treatment based on her pregnancy." (Id. at 8).

In its Motion, BLG argues that both these claims fail because Rollins cannot show that her complaining about not being able to take sufficient lactation breaks was the "but-for" cause of her termination or other employment action. (Doc. # 39 at 26-27).

Rollins failed to address her pregnancy retaliation claims at all in her response to the Motion. She only addressed her claim for pregnancy discrimination under the

PDA. (Doc. # 45 at 19-20). Regarding all of her FCRA claims, Rollins merely wrote: "for the same reasons that summary judgment is not warranted on the federal claims, it is also not warranted on Plaintiff's FCRA claims." (Doc. # 45 at 20). As Rollins never argued that summary judgment was inappropriate on the federal pregnancy retaliation claim, Rollins has not raised an argument as to the FCRA pregnancy retaliation claim either.

Because she failed to respond to BLG's arguments regarding pregnancy retaliation under either the PDA or the FCRA, Rollins has abandoned these claims. See Floyd v. Home Depot U.S.A., Inc., 274 F. App'x 763, 765 (11th Cir. 2008)("In his brief in opposition to Home Depot's motion for summary judgment, Floyd failed to respond to Home Depot's argument that he could not state a prima facie case of hostile environment harassment because he could not show that the alleged conduct was severe or pervasive or altered the terms and conditions of his employment. Therefore, even if his claim were not time barred, he has waived this argument."); Powell v. Am. Remediation & Envtl., Inc., 61 F. Supp. 3d 1244, 1253 n.9 (S.D. Ala. 2014)("[W]here the non-moving party fails to address a particular claim asserted in the summary judgment motion but has responded to other claims made by the movant,

29

the district court may properly consider the non-movant's
default as intentional and therefore consider the claim
abandoned."), <u>aff'd</u>, 618 F. App'x 974 (11th Cir. 2015).

Summary judgment is granted on Counts 2 and 5.

**C.   <u>Other Claims</u>**

All of Rollins' remaining claims — for pregnancy
discrimination, disability discrimination, and FMLA
retaliation — are analyzed using the burden-shifting
framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792
(1973), and its progeny. <u>See</u> <u>Armstrong v. Flowers Hosp., Inc.</u>,
33 F.3d 1308, 1314 (11th Cir. 1994)(holding that the burden-
shifting framework applied to pregnancy discrimination cases
is the same as analysis in other Title VII sex discrimination
cases); <u>Earl v. Mervyns, Inc.</u>, 207 F.3d 1361, 1365 (11th Cir.
2000)("The burden-shifting analysis of Title VII employment
discrimination claims is applicable to ADA claims."); <u>Batson
v. Salvation Army</u>, 897 F.3d 1320, 1328 (11th Cir.
2018)("Where, as here, an employee alleges retaliation under
the FMLA or the ADA without direct evidence of the employer's
intent, we apply the burden shifting framework established in
[<u>McDonnell Douglas</u>]."); <u>Penaloza v. Target Corp.</u>, 549 F.
App'x 844, 846 (11th Cir. 2013)("The analysis for a pregnancy
discrimination claim is the same as for a Title VII sex

30

discrimination claim. The Title VII analysis also applies to FCRA claims." (citation omitted)); Byrd v. BT Foods, Inc., 948 So. 2d 921, 925 (Fla. 4th DCA 2007)("As applied to discrimination based on a handicap, the FCRA is construed in conformity with the federal [ADA].").

Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination or retaliation, which creates a rebuttable presumption that the employer acted illegally. McDonnell Douglas, 411 U.S. at 802-03. Once the plaintiff has established a prima facie case, the burden shifts to the defendant. Id.; Dickinson v. Springhill Hosps., Inc., 187 F. App'x 937, 939 (11th Cir. 2006). To rebut the presumption of discrimination or retaliation created by the plaintiff's prima facie case, the defendant must provide "legitimate, nondiscriminatory reason[s]" for the employment action taken against the plaintiff. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1331 (11th Cir. 1998). If the defendant produces such evidence, the burden shifts again to the plaintiff. McDonnell Douglas, 411 U.S. at 802-03. The plaintiff then "has the opportunity to come forward with evidence, including the previously produced evidence establishing [his] prima facie

case, sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1528 (11th Cir. 1997).

### 1. <u>Disability Discrimination</u>

Pursuant to the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). In order to succeed on a discrimination claim under the ADA, Rollins must show that: "(1) [s]he is disabled; (2) [s]he was a qualified individual at the relevant time, meaning [s]he could perform the essential functions of the job in question with or without reasonable accommodations; and (3) [s]he was discriminated against [] because of [her] disability." <u>Scott v. Shoe Show, Inc.</u>, 38 F. Supp. 3d 1343, 1359 (N.D. Ga. 2014)(citation omitted). "The term 'disability' means, with respect to an individual — (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C)

being regarded as having such an impairment." 42 U.S.C. §
12102(1).

BLG argues that Rollins cannot establish a prima facie
case of disability discrimination under the ADA or FCRA
because, among other reasons, she is not disabled under either
the "substantially limits a major life activity" or "regarded
as disabled" standard. (Doc. # 39 at 22-26).

In response, Rollins does not address whether BLG
regarded her as disabled and has thus waived this argument.
See Floyd, 274 F. App'x at 765. But she insists that her
aneurysm qualifies as a disability under the "substantially
limits a major life activity" standard. (Doc. # 45 at 17).

"[C]ourts are instructed that '[t]he term "substantially
limits" shall be construed broadly in favor of expansive
coverage, to the maximum extent permitted by the terms of the
ADA.'" Vaughan v. World Changers Church Int'l, Inc., No. 1:13-
CV-0746-AT, 2014 WL 4978439, at *8-9 (N.D. Ga. Sept. 16,
2014)(quoting 29 C.F.R. § 1630.2(j)(1)(i)). "Under this more
lenient standard, courts consider whether an impairment
'substantially limits the ability of an individual to perform
a major life activity as compared to most people in the
general population.'" Id. (quoting 29 C.F.R. §
1630.2(j)(ii)). "Even an episodic impairment may be a

disability under the Act 'if it would substantially limit a major life activity when active.'" Id. (quoting 42 U.S.C. 12102(4)(D)).

To prove she is disabled, Rollins points to her declaration, in which she avers that her aneurysm "causes vision issues and headaches," which "make [her] unable to work, drive, read, concentrate, think clearly, and see." (Doc. # 45-3 at 1). But Rollins does not aver that the vision issues and headaches caused by her aneurysm "substantially limit" these major life activities. Additionally, Rollins does not identify in the declaration how frequently she suffers from vision problems and headaches. See Munoz v. Selig Enterprises, Inc., No. 116CV03924MHCJCF, 2018 WL 9440321, at *6 (N.D. Ga. July 3, 2018)("Plaintiff generally asserts that there were occasions on which she was unable to control her digestive functions, sit at a desk, or operate a vehicle. But the record does not reflect how frequently such episodes occurred — if indeed more than once — such that a jury could infer those activities were *substantially* limited by her symptoms."), report and recommendation adopted as modified, No. 1:16-CV-3924-MHC, 2018 WL 9441063 (N.D. Ga. Sept. 20, 2018).

34

At most, Rollins wrote in one email toward the end of her employment that she suffered headaches "at least twice a week." (Doc. # 40-11 at 131-32). Her occasional symptoms only lasted a couple of hours to a day or two. (Doc. # 40-1 at 18:16-19:4, 25:5-8). Because the symptoms are intermittent, Rollins testified that the aneurysm limited her ability to work on "some days" only. (Id. at 24:15-18). When she did experience vision problems and headaches during work, Rollins could go home early to sleep. (Id. at 18:12-19:3, 24:5-25:8, 55:2-10).

Regarding the major life activities of driving, reading, concentrating, thinking clearly, and seeing, the evidence is insufficient to show that Rollins' aneurysm "substantially limited" these activities. Rollins was only limited in these activities when she had sporadic episodes of blurred vision or headaches. And she has produced no evidence, besides the conclusory statement in her declaration, to support that these activities were substantially limited during an episode. See, e.g., Allen v. SouthCrest Hosp., 455 F. App'x 827, 832-33 (10th Cir. 2011) ("[T]aken as a whole, the evidence showed that Ms. Allen's migraines, when active and treated with medication, did not permit her to perform activities to care for herself in the evenings and compelled her to go to

35

sleep instead. But it was her burden to make more than a conclusory showing that she was *substantially* limited in the major life activity of caring for herself as compared to the average person in the general population."); Munoz, 2018 WL 9440321, at *7 ("The record evidence of Plaintiff's impairments — specifically, her own declaration and deposition testimony — is simply too undeveloped to support an inference by a reasonable factfinder that any of her major life activities were substantially limited by her impairments."); Vaughan, 2014 WL 4978439, at *10 ("The Court recognizes that an ADA plaintiff does not necessarily need medical evidence to substantiate her disability assertions. But in this case, given the conclusory nature of her own affidavit, and vague nature of her deposition testimony, without additional clarity — from, for example, a medical professional — regarding the specific pain her medical condition caused and the limitations on major life activities resulting from the condition and pain, a jury has no evidence from which to infer that Vaughan's condition was substantial.").

In short, while Rollins' declaration and deposition establish that these major life activities were affected by her occasional headaches and vision issues, they do not

establish a substantial limitation of these activities. See
Woolf v. Bloomberg L.P., No. 16-CV-6953 (PKC), 2019 WL
1046656, at *12 (S.D.N.Y. Mar. 5, 2019)("Hutchinson's letter
and Woolf's deposition testimony are some evidence that
Woolf's migraines affected his major life activities of
seeing and speaking, but they do not go toward whether those
activities were 'substantially limit[ed] . . . as compared to
most people in the general population.' Woolf has not directed
the Court to evidence of how and to what extent his sight,
speech and concentration were affected. Drawing every
reasonable inference in favor of Woolf, he has demonstrated
only that these categories of life activity were in some way
affected by his migraines, but not that they were
substantially limited." (citations omitted)), aff'd sub nom.
Woolf v. Strada, 949 F.3d 89 (2d Cir. 2020), and aff'd sub
nom. Woolf v. Strada, 792 F. App'x 143 (2d Cir. 2020).

Nor does the evidence establish that Rollins was
substantially limited in the major life activity of working.
"A plaintiff claiming that she is substantially limited in
the major life activity of working must establish that her
condition significantly restricts her ability to perform
either a class of jobs or a broad range of jobs in various
classes as compared to the average person having comparable

37

training, skills, and abilities." <u>Hudson v. Tyson Farms, Inc.</u>, 769 F. App'x 911, 916 (11th Cir. 2019).

There is nothing in the record to suggest that Rollins was significantly restricted in her ability to perform her job, let alone a broad range of other jobs. <u>See</u> <u>Id.</u>; <u>see also</u> <u>Ward v. City of Gadsden</u>, No. 4:15-CV-0865-VEH, 2017 WL 568556, at *7 (N.D. Ala. Feb. 13, 2017)("[T]here is no record of Mr. Ward's missing a substantial amount of work as compared to most other people because of his depression or being disciplined substantially more than others due to missed days attributable to his treatment for depression. . . . While Mr. Ward did occasionally miss work to see his VA doctor, there is no indication that these missed days substantially impacted his overall ability to perform his job as compared to other people or even that those missed days led to his discharge.").

Thus, a reasonable jury could not conclude that Rollins is disabled under the ADA or the FCRA. Summary judgment is granted to BLG on the disability discrimination claims, Counts 6 and 7.

## 2.  **Pregnancy Discrimination**

The PDA amended Title VII to include "pregnancy, childbirth, or related medical conditions" in its definition

of sex-based discrimination. 42 U.S.C. § 2000e(k)(2). BLG does not contest Rollins' argument that breastfeeding is a protected classification. Indeed, the Eleventh Circuit has explicitly held that breastfeeding is  covered by the PDA. See <u>Hicks v. City of Tuscaloosa, Alabama</u>, 870 F.3d 1253, 1260 (11th Cir. 2017)("We have little trouble concluding that Congress intended the PDA to include physiological conditions post-pregnancy. The PDA would be rendered a nullity if women were protected during a pregnancy but then could be readily terminated for breastfeeding — an important pregnancy-related 'physiological process.'").

Rollins "must establish a prima facie case by showing that (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to an adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably." <u>Penaloza</u>, 549 F. App'x at 846 (11th Cir. 2013).

Importantly, the Eleventh Circuit has clarified that "[t]aking adverse actions based on [a] woman's breastfeeding is prohibited by the PDA but employers are not required to give special accommodations to breastfeeding mothers." <u>Hicks</u>, 870 F.3d at 1260. "Instead employers are only required to treat pregnant employees the same as 'other persons not so

affected but similar in their ability or inability to work.'" Poague v. Huntsville Wholesale Furniture, 369 F. Supp. 3d 1180, 1196 (N.D. Ala. 2019)(quoting 42 U.S.C. § 2000e(k)); see also Hicks, 870 F.3d at 1261 (finding that a valid PDA claim existed when plaintiff "showed that other employees with temporary injuries were given 'alternative duty,' and [plaintiff] merely requested to be granted the same alternative duty."). Hicks did not suggest that a plaintiff can establish a claim of pregnancy discrimination simply by pointing out that she did not receive a sufficient accommodation for her breastfeeding. See also Dudhi v. Temple Health Oaks Lung Ctr., No. CV 18-3514, 2020 WL 996915, at *7 (E.D. Pa. Mar. 2, 2020)("Ms. Dudhi's claims do not turn on whether she, as a breastfeeding mother, requested and was denied an accommodation. Rather, they turn on whether similarly situated, non-breastfeeding employees were treated more favorably than she was.").

BLG argues that Rollins' pregnancy discrimination claims, Counts 1 and 4, fail because Rollins was not qualified for her job, she has not identified relevant comparators, and she cannot establish pretext for her termination. (Doc. # 39 at 19-22, 29).

Rollins failed to address BLG's argument regarding her qualifications. Therefore, Rollins has abandoned the argument that she was qualified for her position. <u>See</u> <u>Floyd</u>, 274 F. App'x at 765 ("In his brief in opposition to Home Depot's motion for summary judgment, Floyd failed to respond to Home Depot's argument that he could not state a prima facie case of hostile environment harassment because he could not show that the alleged conduct was severe or pervasive or altered the terms and conditions of his employment. Therefore, even if his claim were not time barred, he has waived this argument."). Thus, Rollins' pregnancy discrimination claims fail based on this element alone.

Regardless, even if Rollins had shown that she was qualified for her job, summary judgment would still be appropriate on these claims. Rollins has failed to identify non-pregnant comparators treated more favorably. "[A] plaintiff proceeding under <u>McDonnell Douglas</u> must show that she and her comparators are 'similarly situated in all material respects.'" <u>Lewis v. City of Union City</u>, 918 F.3d 1213, 1226 (11th Cir. 2019). To determine whether a comparator is similarly situated in all material respects, courts consider whether the comparator (1) "engaged in the same basic conduct (or misconduct) as the plaintiff"; (2) has "been

41

subject to the same employment policy, guideline, or rule as the plaintiff"; (3) "ordinarily (although not invariably) [has] been under the jurisdiction of the same supervisor as the plaintiff"; and (4) "share[d] the plaintiff's employment or disciplinary history." Id. at 1227-28.

Rollins states in the pregnancy discrimination section of her response: "The facts here show that other employees were allowed to work extended hours and/or work from home to catch up on work but [Rollins] was not." (Doc. # 45 at 20). But Rollins does not name these comparators, provide analysis on whether these comparators are similarly situated, or cite any record evidence in support of that statement.

At most, Rollins mentions two potential comparators in her statement of material facts: Onelja Shehaj and Megan Fight. (Id. at 7-8). In her statement of material facts, Rollins merely identifies Fight as "[a]t least one other legal assistant at BLG [who] was allowed to work from home." (Id. at 8). However, not enough information is provided to support that Fight is an appropriate comparator. Fight is a legal assistant in BLG's Tampa office in the general trial practice group who is permitted to work from home. (Doc. # 45-2 at 60:6-61:14). But there is no evidence in the record why Fight is permitted to work from home, besides that she does not

work from home as a disability accommodation. (Id.). Nor is there any information about Fight's performance or disciplinary history. Without any further evidence in the record or analysis by Rollins regarding Fight, Rollins has not shown that Fight is similarly situated to her. Indeed, the limited information about Fight suggests that she is not similarly situated in all material respects because she worked in a different BLG office in a different practice group.

Regarding Shehaj, who was also a legal assistant in the PIP/SIU practice group in BLG's St. Petersburg office, Rollins averred in her declaration that she once overheard Shehaj "flatly refus[e] to do work assigned by her attorney." (Doc. # 45-3 at 2). Additionally, Rollins emphasizes that Shehaj "was counseled more than once about working unauthorized overtime." (Doc. # 45 at 7). However, these allegations do not support that Shehaj was allowed to work extended hours or from home, while Rollins was not. Indeed, Shehaj was disciplined for working unauthorized overtime, suggesting she was not permitted to work extended hours. (Doc. # 40-11 at 146-48). Thus, there is no evidence that Shehaj was similarly situated to Rollins but was allowed to work overtime hours or work from home.

In short, Rollins has failed to establish a prima facie case of pregnancy discrimination. Summary judgment is accordingly granted for BLG on these counts.

3.   **FMLA Retaliation**

i.   **Prima Facie Case**

"Where, as here, a plaintiff alleges an FMLA retaliation claim without direct evidence of the employer's retaliatory intent, [courts] apply the burden shifting framework established by the Supreme Court in" McDonnell Douglas. Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006). "A plaintiff bringing an FMLA retaliation claim must show that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." Bradley v. Army Fleet Support, LLC, 54 F. Supp. 3d 1272, 1282 (M.D. Ala. 2014). "To state a prima facie case of retaliation under the FMLA, a plaintiff must show that (1) he engaged in a statutorily protected activity, (2) he suffered an adverse employment action, and (3) the adverse action was causally related to a protected activity." Id. "If the plaintiff makes out a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action." Id.

44

Regarding the prima facie case, BLG argues that only Rollins' termination qualifies as a materially adverse action and that Rollins cannot establish causation for her termination.

In the context of a Title VII retaliation claim, the Supreme Court held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'" Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). This is because "[t]he anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Id. at 67. This standard is "decidedly more relaxed" than the standard for adverse employment actions applicable to discrimination cases. Crawford v. Carroll, 529 F.3d 961, 973 (11th Cir. 2008).

It appears that the Eleventh Circuit has not yet decided whether the Burlington Northern standard applies to FMLA retaliation claims. See Foshee v. Ascension Health-IS, Inc., 384 F. App'x 890, 891 (11th Cir. 2010)("[W]e have not addressed whether the 'materially adverse effect' standard articulated in Burlington Northern should apply to claims of

45

FMLA retaliation. However, it is unnecessary for us to decide whether Burlington Northern applies in FMLA retaliation cases in order to dispose of this appeal  . . .”). However, multiple other circuits have held that the Burlington Northern standard applies to FMLA retaliation claims. See Millea v. Metro-N. R.R. Co., 658 F.3d 154, 164 (2d Cir. 2011)(“We therefore join our sister circuits that have considered this issue and apply the Burlington Northern standard for materially adverse action to the FMLA context.”); Breneisen v. Motorola, Inc., 512 F.3d 972, 979 (7th Cir. 2008)(applying Burlington Northern anti-retaliation standard to FMLA retaliation claims); Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1171 n.2 (10th Cir. 2006)(same). Thus, the Court finds that the more lenient Burlington Northern standard applies to this claim.

Even under the Burlington Northern standard, one of the three employment actions Rollins complains of cannot support her claim. Specifically, in her response, Rollins states that “a number of things [] happened to [Rollins] after her return from FMLA leave and request for accommodations — from the increased workload, to being scolded for asking for help, to being terminated — that could dissuade a reasonable employee from exercising their own rights under the FMLA.” (Doc. # 45

46

at 13). Thus, Rollins bases her FMLA retaliation claim on (1) her workload, (2) being chastised for asking for help, and (3) her termination.

Regarding asking for help, Rollins avers in her declaration that she "was told that [she] could ask for help if [she] was overwhelmed." (Doc. # 45-3 at 1). But, "when [she] did ask another assistant for help, [she] was reprimanded and told that [she] had to ask an attorney's permission each time prior to asking another staff member for help," which Rollins considered impractical. (Id.). The record reflects that all legal assistants were required to receive attorney approval before asking a fellow assistant to help with her assignments. (Doc. # 40-11 at 119).

Being told by a supervisor to get attorney approval before asking another legal assistant for help is not a "materially adverse" action that would dissuade a reasonable worker from making or supporting a charge of discrimination. It is a trivial harm. See Sanders v. Benjamin Moore & Co., No. 4:11-CV-0397-JEO, 2015 WL 1489855, at *41 (N.D. Ala. Mar. 31, 2015)("[I]t is clear that the 'nitpicking' (*i.e.,* the requirement that plaintiff attend weekly meetings with Recca, Recca's criticism of plaintiff's calendar entries, and Pallozzi's comments that plaintiff was 'insubordinate')

47

amounts to trivial harms."). Being scolded for asking for help without approval is less severe than other actions — such as placing an employee on a performance improvement plan or formal coachings — that have been held insufficient to support retaliation claims. See Jarvis v. Siemens Med. Sols. USA, Inc., 460 F. App'x 851, 858 (11th Cir. 2012)(holding that placement on performance improvement plan was not materially adverse action to establish prima facie case of retaliation); Hall v. Dekalb Cty. Gov't, 503 F. App'x. 781, 790 (11th Cir. 2013)(concluding that a written counseling was not a materially adverse action because the plaintiff "failed to explain how it negatively impacted his employment"). Rollins has not shown that she was injured or harmed by being scolded for failing to get attorney approval or that it had a significant impact on her employment. See Godbolt v. Sam's E., Inc., No. 8:12-cv-1650-T-24TBM, 2013 WL 4781064, at *6 (M.D. Fla. Sept. 6, 2013)("Plaintiff, however, has not shown that she was injured or harmed by the coachings or that it had any significant impact on her employment. This is fatal to her claim."). Thus, she cannot proceed based on this employment action.

However, the Court finds that Rollins' heavy workload when she returned from leave was a materially adverse action.

True, an increased workload is not an adverse employment action for discrimination claims. See Grimsley v. Marshalls of MA, Inc., 284 F. App'x 604, 609 (11th Cir. 2008)("Although Grimsley's workload sometimes increased and he was occasionally assigned additional tasks, these kinds of temporary assignments, without a change in compensation or position, do not amount to a 'serious and material change in the terms, conditions, or privileges of employment.'").

Still, an increased workload meets the lower Burlington Northern standard. A heavy workload could dissuade a reasonable employee from engaging in protected activity. See Smith v. Quintiles Transnational Corp., 509 F. Supp. 2d 1193, 1203 (M.D. Fla. 2007)(holding that placement on a performance improvement plan was a materially adverse action for purposes of a retaliation claim because the plan resulted in, among other things, "an increased workload"); Burlington N., 548 U.S. at 70–71 ("Common sense suggests that one good way to discourage an employee such as White from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable. That is presumably why the EEOC has consistently found '[r]etaliatory

work assignments' to be a classic and 'widely recognized' example of 'forbidden retaliation.'").

Thus, the two employment actions on which Rollins may base her FMLA retaliation claim are her workload and her termination. But Rollins cannot establish that these actions were causally related to her use of FMLA leave. Generally, a plaintiff can satisfy the causation prong by "prov[ing] that the protected activity and the negative employment action are not completely unrelated." Meeks v. Computer Assocs., 15 F.3d 1013, 1021 (11th Cir. 1994).

Here, there is significant record evidence that the workloads of all BLG employees in the PIP/SIU group increased while Rollins was out on leave. During the summer of 2018, "a client sent a large number of new glass cases to BLG to handle." (Doc. # 40-10 at 5). And Rollins acknowledged that all legal assistants were very busy at this time. (Doc. # 40-1 at 95:21-96:21, 98:12-20, 192:3, 192:10-14). Although there was temporal proximity between her return from FMLA leave and her increased workload, the evidence shows that Rollins' workload was higher after her leave because the PIP/SIU group as a whole became significantly busier while Rollins was out on leave. Thus, there is no genuine issue of material fact regarding the cause of Rollins' increased workload.

Rollins has also failed to establish causation regarding her termination. "The FMLA does not insulate an employee who has requested medical leave from being terminated for poor performance. So long as the employer would have taken the same action it did regardless of the request for leave, there is no statutory violation." Gamba v. City of Sunrise, 157 F. App'x 112, 113 (11th Cir. 2005). Here, the record is replete with evidence of Rollins' performance issues before she took FMLA leave, which continued after she returned from leave. See Id. ("Although Gamba contends his termination was in retaliation for having requested leave under FMLA, the City's position that he was terminated after numerous documented instances of unsatisfactory job performance is well-supported by the record."). Rollins had been informed that her performance needed to improve before she caused a second default, ultimately resulting in her termination.

The lack of temporal proximity further supports the lack of causal connection between Rollins' FMLA leave and termination. Rollins first informed BLG of her upcoming need for FMLA leave in October 2017, seventeen months before her termination. Rollins began her FMLA leave in June 2018 and was terminated on March 25, 2019 — a span of nine months. And Rollins returned from FMLA leave in early September 2018 —

over six months before her termination. Thus, Rollins cannot establish causation by temporal proximity. See Brisk v. Shoreline Found., Inc., 654 F. App'x 415, 417 (11th Cir. 2016) ("[T]he district court correctly granted summary judgment because there was no causal connection between the protected conduct — Brisk taking FMLA leave — and the adverse event, termination, when the temporal proximity of four months was tenuous and there was an intervening cause of poor work performance.").

Summary judgment is therefore granted to BLG on Rollins' FMLA retaliation claim, Count 3.

### ii. Non-Retaliatory Reason and Pretext

Even if Rollins could establish a prima facie case of retaliation based on her increased workload and termination, BLG has produced legitimate, non-discriminatory reasons for those actions and Rollins has not shown a genuine issue of material fact regarding pretext.

As mentioned above, BLG noted that it became very busy in the summer of 2018 — while Rollins was out on FMLA maternity leave — because "a client sent a large number of new glass cases to BLG to handle." (Doc. # 40-10 at 5). Thus, all members of the PIP/SIU group had increased workloads during September 2018, when Rollins returned from leave.

Additionally, BLG explains that it terminated Rollins because of "her well-documented history of repeated performance errors, with the March 2019 failure to calendar a deadline that caused yet another default being the last straw." (Doc. # 39 at 29). Thus, BLG has met its burden of producing legitimate, non-discriminatory reasons for its actions.

The burden now shifts to Rollins to show pretext. "A legitimate nondiscriminatory reason proffered by the employer is not a pretext for prohibited conduct unless it is shown that the reason was false and that the real reason was impermissible retaliation or discrimination." Worley v. City of Lilburn, 408 F. App'x 248, 251 (11th Cir. 2011)(citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot merely recast the reason, but must meet it 'head on and rebut it.'" Id. (quoting Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000)). Thus, to show pretext, an employee must demonstrate "such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." McCann v. Tillman, 526 F.3d 1370, 1375 (11th Cir.

2008)(quoting <u>Cooper v. Southern Co.</u>, 390 F.3d 695, 725 (11th Cir. 2004)).

Rollins has not presented sufficient evidence of pretext. She has not rebutted that her workload increased upon her return from FMLA leave because her practice group had become significantly busier while she was out. While Rollins felt that she had the highest workload, she testified that all legal assistants and attorneys in the PIP/SIU group were "overwhelmed by all the new cases" that had come in during the summer of 2018. (Doc. # 40-1 at 95:21-96:21, 189:9-15). Her mere belief that her workload was increased the most in retaliation for taking leave fails to create a genuine issue of material fact regarding pretext and her workload.

Rollins also acknowledges that she made numerous mistakes before she was terminated, and the record supports BLG's progressive counseling and disciplining of Rollins. Although Rollins insists that BLG did not terminate Gonzalez and Shehaj, "employees who had similar or worse performance issues," neither is similarly situated to Rollins. (Doc. # 45 at 15). Gonzalez is an attorney — not a legal assistant — and there is no evidence of poor performance by her. There is no evidence that Shehaj committed the same types of errors as Rollins; the record only shows that Shehaj was occasionally

insubordinate and worked unapproved overtime. Thus, Shehaj and Gonzalez are dissimilar from Rollins and cannot be used as comparators to prove pretext. See Lewis, 918 F.3d at 1226 ("[A] plaintiff proceeding under McDonnell Douglas must show that she and her comparators are 'similarly situated in all material respects.'"). In short, despite her arguments on this issue (Doc. # 45 at 15-16), Rollins has not rebutted BLG's legitimate, non-discriminatory reason for terminating Rollins.

While Rollins is clearly dissatisfied with BLG's treatment of her, it is not the Court's place to question an employer's judgment. See Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999)("We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."). The Court merely reviews whether an employer's decision was motivated by retaliation. Here, Rollins has not created a genuine issue of material fact as to that question.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendant Banker Lopez & Gassler, PA's Motion for Summary Judgment (Doc. # 39) is **GRANTED.**

(2)   The Clerk is directed to enter judgment in favor of Defendant Banker Lopez & Gassler, PA and against Plaintiff Jennifer Rollins on all counts of the complaint.

(3)   Thereafter, the Clerk is directed to terminate all pending deadlines and **CLOSE** the case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 30th day of July, 2020.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

56